UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------X

SUNNI, LLC, SUNNI III, LLC, and SAMMY
HINNAWI,

                                Plaintiffs,

                v.

EDIBLE ARRANGEMENTS, INC.,

                                Defendant.

---------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: March 25, 2014

14 Civ. 461 (KPF)

OPINION AND ORDER

KATHERINE POLK FAILLA, District Judge:

Sammy Hinnawi, individually and through his corporations Sunni, LLC,

and Sunni III, LLC, owns and operates three Edible Arrangements franchise

stores in Manhattan and the Bronx.  In January 2012, Hinnawi pleaded guilty

in New York State Supreme Court to two felonies stemming from his filing of

false tax returns for, and his theft of sales tax revenues from, multiple Edible

Arrangements franchises over multiple years.  In October 2013, shortly after

receiving a copy of Hinnawi's plea agreement in the criminal case, Edible

Arrangements, Inc. ("EA") notified Plaintiffs that it was terminating or not

renewing their franchise agreements because of Hinnawi's felony convictions.

Plaintiffs filed an action for injunctive relief in New York State Supreme

Court; Defendant then removed the action to this Court.  Plaintiffs now move

for a remand, contending that this Court lacks subject matter jurisdiction.

Failing that, Plaintiffs move for a preliminary injunction to bar Defendant from

terminating the relevant franchise agreements, until the parties' disputes can be arbitrated. Plaintiffs' motion to remand is denied because Defendant has demonstrated to a reasonable probability that the amount in controversy requirement is satisfied. Plaintiffs' motion for a preliminary injunction is also denied, because Plaintiffs have failed to demonstrate that they would suffer irreparable harm, or that their claims have a likelihood of success on the merits.

## BACKGROUND[1]

### A.   Factual Background

#### 1.   The Parties

Plaintiffs own and operate three Edible Arrangements franchises in New York City. Sunni, LLC operates a franchise at 620 West 38th Street, New York, New York (Store #135); Sunni III, LLC operates a franchise at 2571 Broadway, New York, New York (Store #200); and Hinnawi operates a franchise located at 3530 Johnson Avenue, Bronx, New York (Store #489). (Pl. PI Br. 1; Def. PI Ex. A, B, C). Hinnawi is a co-owner of all three franchises. (*Id.*). Defendant EA is a Delaware corporation, with its principal place of business in Wallingford, Connecticut. (Notice of Removal (Dkt. #1) ¶ 7).

---

[1]   For convenience, Plaintiffs' Memorandum of Law in Support of Their Motion for a Preliminary Injunction will be referred to as "Pl. PI Br.," Defendant's opposition thereto as "Def. PI Opp.," and accompanying exhibits as "Def. PI Ex."; Plaintiffs' Memorandum of Law in Support of Their Motion to Remand as "Pl. Rem. Br.," Defendant's opposition thereto as "Def. Rem. Opp.," and accompanying exhibits as "Def. Rem. Ex." The facts alleged herein are drawn from the parties' briefs and the evidence and testimony put forth at the March 3, 2014 hearing; the transcript of the hearing will be referred to as "Mar. 3 Tr.," and the exhibits introduced at that hearing will be referred to as they were admitted at the hearing, namely "Pet. Ex." for Plaintiffs' exhibits, and "Resp. Ex." for Defendant's exhibits.

### 2.     Plaintiffs' Franchise Agreements

Plaintiffs entered into 10-year franchise agreements with EA in 2003 (for Sunni, LLC), 2007 (for Hinnawi), and 2009 (for Sunni III, LLC) (collectively, the "Agreements").  (Def. PI Opp. 2; Def PI. Ex. A, B, C).  The Agreements are governed by Connecticut law (*see* Pl. PI Br. 9 n.4), and provide in relevant part that:

- The Franchisee shall maintain the condition and appearance of all store locations consistent with EA standards, and if at any point EA deems that store not in compliance, EA will notify the store of the deficiency so that the Franchisee may correct it.

- The Franchisee shall maintain the highest moral standards of the community and as set forth by EA.

- EA may terminate the agreement upon delivery of written notice of termination if the Franchisee or any of its owners (i) is or has been convicted of or pleads guilty to a felony; (ii) engages in any dishonest or unethical conduct which, in EA's opinion, adversely affects the reputation or the goodwill of the Names and Marks or the reputation of EA; or (iii) fails to pay any federal or state income taxes.

- EA would not waive any right the agreement reserves due to any custom or practice at variance with the agreement's terms, or any failure to exercise a right provided for under the agreement.

- The Franchisee shall operate the business in full compliance with all applicable laws.

(Def. PI Ex. A at 22, 25, 27-28, 43-44).

### 3.     Hinnawi's Criminal Convictions

In January 2012, Hinnawi pleaded guilty, pursuant to a plea agreement with the Office of the District Attorney for the County of New York (the "D.A.'s

3

Office"), to criminal tax fraud in the second degree, a felony, related to the theft of sales taxes collected from customers of his three EA stores, as well as his brother's three EA stores, from approximately 2004 to 2011.  (Def. PI Opp. 4; Def. PI Ex. I).  Hinnawi also pleaded guilty to criminal tax fraud in the fourth degree, also a felony, related to his filing of a false tax return for one of his EA stores.  (*Id.*).  Hinnawi paid over $750,000 in back taxes, interest, and penalties, and served intermittent jail time.  (Def. PI Opp. 4; Def. PI Ex. I).

Hinnawi testified that he provided a copy of his plea agreement in April 2012 to Caroline Gilroy, EA's general counsel, by fax, though he has no proof of having done so.  (Mar. 3 Tr. 30-31, 64-66).  However, both EA witnesses testified that Gilroy was not affiliated with EA until at least July 2012.  (Mar. 3 Tr. 123, 143).[2]  EA alleges that it first became aware of "Mr. Hinnawi's legal troubles" two months later, in June 2012.  (Def. PI Opp. 4).  That same month, Frank Garrido, EA's Vice President of Operations, asked Hinnawi to provide EA with a copy of his plea agreement.  (Mar. 3 Tr. 115-17).  Thereafter, Hinnawi e-mailed a version of the plea agreement to Garrido.  (Def. PI Opp. 4; Def. PI Ex. F; Mar. 3 Tr. 68, 117-18).

As it happened, the version of the plea agreement that Hinnawi mailed to Garrido was neither complete nor final.  It was a modifiable Word document that was not on official letterhead; it was unsigned; it omitted a number of

---

[2]     Hinnawi also testified that in the summer of 2011, he and the president of EA discussed Hinnawi's criminal investigation because EA had received a request for information from the D.A.'s Office.  (Mar. 3 Tr. 31-32).  Hinnawi further testified that he had only just learned of the investigation at that point and, understandably, did not advise EA that he intended to plead guilty at that time.  (*Id.* at 48-49).

pages; and it was dated five days before Hinnawi's actual guilty plea. (Mar. 3 Tr. 81-83, 120-21). On these bases, Garrido believed the plea agreement to be incomplete or altered, and followed up at least three times with Hinnawi shortly thereafter to request the final version. (Mar. 3 Tr. 120-21, 131-33, 136-37; *but see* Mar. 3 Tr. 75 (Hinnawi testifying to not altering the document, and to passing along only what his criminal attorney had provided to him)).

Importantly, the incomplete plea agreement that Hinnawi forwarded to Garrido omitted the page that contained Hinnawi's allocution. Consequently, it failed to disclose, among other things, the fact that Hinnawi had stolen sales tax revenues from his brother's three EA stores, the exact stores from which he had stolen sales tax revenues, the years in which the theft and underreporting had occurred, and the amount of money that had been stolen or underreported. (*Compare* Def. PI Ex. F *and* I; Mar. 3 Tr. 81-83).[3] After following up with Hinnawi throughout July 2012, and receiving assurances that Hinnawi would provide the complete plea agreement, Garrido forwarded the incomplete plea agreement to EA's finance department for their follow up. (Mar. 3 Tr. 137, 139-40). Regrettably, the record reflects that no one from EA's finance department, or from any department, followed up with Hinnawi regarding the plea agreement until nearly a year later, in June 2013.

---

[3]     For example, the version sent to Garrido suggested, erroneously, that the theft of sales tax had taken place only during the period June 2009 through February 2010. (*Compare* Def. PI Ex. F *and* I).

### 4. The Parties' Discussions Concerning the Renewal of the Sunni, LLC Franchise

On May 22, 2013, Karalyn Mendes, a construction services coordinator at EA, sent Hinnawi an e-mail detailing the repairs he would need to complete to bring the Sunni, LLC store (Store #135) into compliance with EA standards. (Def. PI Ex. G). Per the terms of the Agreements, Plaintiffs' stores were only eligible for renewal if they complied with EA standards; moreover, they were required to adhere to EA's standards at all times, irrespective of renewal. (Def. PI Opp. 5 (citing Def. PI Ex. A); Mar. 3 Tr. 121-23). Hinnawi testified that he completed these repairs and modifications at a cost of "thousands of dollars," yet introduced no evidence to corroborate his assertion. (Pl. PI Br. 2; Mar. 3 Tr. 47).[4]

In June 2013, other divisions at EA began to examine those franchises that were eligible for renewal, including Store #135. (Def. PI Opp. 5; Mar. 3 Tr. 144). Around that time, Sarju Patel, EA's Vice President of Compliance, spoke with Hinnawi by phone. (Mar. 3 Tr. 144-45). Hinnawi informed Patel that he was not sure whether he intended to renew or sell his franchise; Patel sent him the renewal paperwork, in case Hinnawi chose that route. (*Id.* at 144-45, 167; Def. PI Ex. H). Patel also outlined the steps involved in the renewal process, including refurbishment of the store. (Mar. 3 Tr. 107-08). Patel and

---

[4]     Plaintiffs allege that the renovation request came after June 2013, when Hinnawi was asked whether he intended to renew the Agreement. (Pl. PI Br. 2). However, the exhibits submitted by Defendant make clear that it was in May 2013, before Hinnawi was asked to confirm his intention to renew in June 2013. (*See* Pet. Ex. I, G). This discrepancy is immaterial to the resolution of Plaintiffs' motions.

Hinnawi also discussed Hinnawi's criminal convictions.  (*Id.* at 145).  In particular, Hinnawi informed Patel that his plea agreement "was not relevant" and "was past him," but that he would "try to get a copy" of the complete plea agreement.  (*Id.*).

On June 19, 2013, Patel sent Sunni, LLC a letter inviting it to apply to renew the Agreement.  (Pl. PI Br. 2; Def. PI Opp. 5; Def. PI Ex. H).  The letter stated "[t]o let us know that you plan to renew your franchise, all you need to do is complete the attached form and return it to me .... Congratulations to you and your team on your outstanding achievement!  We look forward to hearing from you soon, and to renewing your integral role in the World of Edible Arrangements."  (Def. PI Ex. H).  The attached form, dated June 21, 2013, was signed by Hinnawi and his co-owner, and stated:

> I want to renew the franchise for a 10-year term.  I acknowledge that this notice is an expression of my current intent only, and does not create any binding obligation on me or Edible Arrangements International, LLC.  A binding obligation will only be created if and when Edible Arrangements International, LLC and I both sign a written agreement and after satisfaction of any conditions required by Edible Arrangements International, LLC.

(*Id.*).

On August 6, 2013, EA sent Sunni, LLC a letter entitled "Re: EAI Franchise Agreement."  (Def. PI Ex. J).  The letter began "You should not execute the EDIBLE ARRANGEMENTS franchise agreement and related documents until the closing .... *Do not sign any document until we instruct you to do so during the closing.*"  (*Id.* (emphasis added)).  The next day, Hinnawi

7

received two e-mails from EA.  One, with the subject line "Edible Arrangements International, LLC — Franchise Agreement Activated," was sent by Don Schmidt, a franchise development coordinator at EA; it noted, "We are very excited to be at the final stage of you officially becoming an Edible Arrangements franchise owner! Just a few more signatures and you will be joining a very unique and time-tested team of franchise professionals."  (Pet. Ex. 6).  The e-mail contained a link to access "[a] copy of your Edible Arrangements Franchise Agreement," and closed by noting "I will be reaching out to you shortly to walk you through the acceptance of this document and to schedule a signing date."  (*Id.*).  Shortly thereafter, Sarju Patel e-mailed Hinnawi, with the subject line "FW: Edible Arrangements International, LLC — Franchise Agreement Activated," and attached execution copies of, among other documents, the renewal contract for Sunni, LLC.  Patel's e-mail stated, in relevant part, "I am very happy to be … working with you on renewing your franchise agreements … [and] I will be in touch to schedule a time to sign the documents before the expiration date which is October 11, 2013.  (*Id.*).

In connection with the instant motions, Plaintiffs contend that the word "activated" meant that this e-mail constituted an "offer," which Sunni, LLC accepted.  (Pl. PI Br. 2, 10; Mar. 3 Tr. 109-11).  Defendant responds that at this time, it had no intention to be bound, and had not yet reached a decision about renewal because EA was still investigating the scope of Hinnawi's criminal convictions.  (Def. PI Opp. 6; Mar. 3 Tr. 140-41, 146-47, 165).  And, indeed, during that time, EA repeatedly requested a copy of the complete plea

agreement, which Hinnawi ultimately provided on September 17, 2013.  (Def. PI Opp. 6; Mar. 3 Tr. 36-37).

Hinnawi's convictions constituted a ground upon which Defendant could terminate the Agreements.  (Mar. 3 Tr. 149-50).  Hinnawi also breached the terms of the Agreements requiring him to "operate the business in full compliance with all applicable laws," and to pay all relevant state taxes.  (*See, e.g.*, Def. PI Ex. A).  Accordingly, and given the information contained in the plea agreement, EA felt that termination of its relationship with Hinnawi was its only option.  (Def. PI Opp. 7; *see also* Mar. 3 Tr. 138-39 (Garrido testimony regarding EA policy to terminate franchise agreements if franchisee obtained a felony criminal conviction, but not if franchisee was merely the subject of a criminal investigation); *id.* at 149-50, 152-53, 155-56 (Patel testimony regarding EA policy of terminating franchise agreements because of criminal convictions)).

### 5.    EA's Efforts to Terminate the Franchise Relationships

Several weeks later, on October 10, 2013, Defendant, through outside counsel, notified Hinnawi that it would not renew the Agreement with Sunni, LLC (Store #135), and that it would terminate the Agreements with Sunni III, LLC (Store #200) and Hinnawi (Store #489).  (Def. PI Ex. D, K, L).  EA notified Hinnawi that it was exercising its contractual right to sever their relationship, given his "egregious, admitted criminal conduct."  (*Id.*).  EA gave Hinnawi until January 17, 2014, to sell his interests in the franchises to new owners, and

notified Hinnawi that he could have no part in the franchises on an ongoing

basis.  (*Id.*).  The letters further advised

> As you should know, there is nothing more important to
> the EDIBLE ARRANGEMENTS brand than the regard in
> which it is held by the public and franchisee compliance
> with all applicable laws.  So important are the reputation
> of the EDIBLE ARRANGEMENTS and the integrity of the
> franchisees that all franchise agreements in the system,
> including your Franchise Agreement, expressly allow
> EAI not to renew, as well as to terminate, the Agreement
> if the franchisee fails to comply with EAI's requirements.

(*Id.*).

Hinnawi notified EA that he "might need more time … to find buyers for

the franchises."  (Def. PI Opp. 7).  He then took steps to sell his interest in the

three franchises.  (Pl. PI Br. 2).  Hinnawi secured potential buyers, all of whom,

according to Hinnawi, asked that he remain on as a consultant to ensure a

smooth transition.  (*Id.* at 2-3; Mar. 3 Tr. 60-61).  EA would not approve the

sales because it would not allow Hinnawi to have any affiliation whatsoever

with the stores, including as an employee.  (Pl. PI Br. 2-3).

Hinnawi, Sunni, LLC, and Sunni III, LLC filed for arbitration with the

American Arbitration Association, and requested that the matters be

consolidated and heard by a single arbitrator.  (Pl. PI Br. 3).  EA objected and

required Plaintiffs to file a separate arbitration matter for each separate

Agreement; however, EA consented to the matters being heard by a single

arbitrator.  (*Id.*).  EA notified Hinnawi thereafter that it planned terminate the

three franchises' access to the EA online ordering system, before the arbitrator

had decided the matters.  (*Id.*).

10

**B.      Procedural History**

**1.      Injunctive Relief in State Court**

On January 16, 2014, Plaintiffs moved in New York State Supreme Court

for an Order to Show Cause as to why the franchises should not be allowed to

operate during the pendency of the arbitration proceedings.  (Pl. Rem. Br. 2;

*but see* Not. Rem. ¶ 1 (listing the date as January 15, 2014)).  An Order to

Show Cause and a Temporary Restraining Order were issued thereafter and the

matter was set down for a hearing on February 5, 2014.  (Pl. Rem. Br. 2).

Plaintiffs did not, however, file a complaint in that court.  (*Id.*).

**2.      The Instant Action**

EA removed the matter to this Court on January 24, 2014, asserting that

diversity jurisdiction and the amount in controversy requirement were

satisfied.  With respect to the latter issue, EA pointed to Hinnawi's assertions

in state court that should the three franchise stores close during the pendency

of the arbitration, Plaintiffs would suffer "immediate and irreparable harm" and

would "lose hundreds of thousands in income."  (Not. Rem. ¶ 8).

On February 13, 2014, Plaintiffs filed an "emergency letter" requesting an

"immediate … conference with the Court to prevent irreparable harm to

plaintiffs."  (Dkt. #9).   The "emergency" to which Plaintiffs referred was the fact

that on February 18, 2014, EA intended to terminate Plaintiffs' access to the

online ordering platform of EA's website, through which the majority of

Plaintiffs' revenues flow.  (*Id.*; Mar. 3 Tr. 25).  The Court held a telephone

conference with the parties that day, after which Defendant agreed to maintain

the status quo, i.e., allow Plaintiffs access to the EA online ordering system through March 3, 2014, the date the Court set for an evidentiary hearing. (Dkt. #11).  Plaintiffs' motions were filed shortly thereafter (Dkt. #14, 16), as were Defendant's opposition papers (Dkt. #21, 22), and Plaintiffs' reply in support of their motion for a preliminary injunction (Dkt. #23).

At the March 3, 2014 evidentiary hearing, the Court heard extensive testimony from Sammy Hinnawi, as well as from Frank Garrido and Sarju Patel.  The Court also heard oral argument from counsel on Plaintiffs' motion to remand and motion for a preliminary injunction.  Again, Defendant agreed to maintain the status quo until the issuance of this Opinion.

Over the past few months, Plaintiffs have equivocated with respect to the precise harm that would occur should injunctive relief not be granted.  While the parties agreed that the first outward manifestation of termination of the Agreements would be the cessation of Plaintiffs' access to the online ordering system (*see, e.g.*, Dkt. #9, 12, 13), Defendant represented to the Court on February 13, 2014, that Plaintiffs could still accept and fulfill orders placed by phone or in person, even after their access to the online ordering system was terminated.  For this reason, the testimony at the March 3, 2014 hearing focused on what would happen should Plaintiffs' access to the online ordering system be terminated.  (*See, e.g.*, Mar. 3 Tr. 58).

Even after the March 3 hearing, however, the record was silent as to how long this arrangement could continue, whether Defendants would allow Plaintiffs to continue to use the EA marks, or whether Plaintiffs could still

12

purchase raw materials from EA.  (*See* Pl. PI Br. 12).  Accordingly, on March 17, 2014, the Court directed EA to provide information as to what it intended to do with respect to the franchises upon termination of the Agreements, by no later than March 24, 2014.

EA subsequently represented to the Court that upon termination of the Agreements, it intended to exercise its contractual right to assume management of the three franchises on an interim basis until Plaintiffs' claims were resolved in arbitration.  (Def. Mar. 24, 2014 Letter (Dkt. #28)).  Thus, if the Court denied Plaintiffs' motion for a preliminary injunction, EA would assume control and operate the three franchises in a manner consistent with their current operation, including maintaining all leases, retaining staff and employees, and maintaining all appropriate records of the franchises.  (*Id.*).

## DISCUSSION

As noted, Plaintiffs move to remand the matter back to state court and, if the Court declines that motion, for a preliminary injunction preventing Defendant from terminating or not renewing their Agreements until the arbitration proceedings have concluded.  The Court first addresses the jurisdictional question.

### A.    Plaintiffs' Motion to Remand Is Denied

While it is undisputed that the parties are diverse to one another, Plaintiffs allege that Defendant has not met its burden of demonstrating that the amount in controversy exceeds $75,000, pursuant to 28 U.S.C. § 1332(a).  (Pl. Rem. Br. 2; Not. Rem. ¶ 8).  Plaintiffs are wrong.  EA has shown to a

reasonable probability that the claims of at least one Plaintiff exceed $75,000. It need do no more.

### 1.    Applicable Law

Section 1332 states in relevant part that "[t]he district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between ... citizens of different States...." 28 U.S.C. § 1332(a). Defendant, as the removing party, bears "the burden of proving that it appears to a reasonable probability that the claim is in excess of the statutory jurisdictional amount." *Mehlenbacher* v. *Akzo Nobel Salt, Inc.*, 216 F.3d 291, 296 (2d Cir. 2000) (internal citation omitted).

"To determine whether that burden has been met, [the Court must] look first to the plaintiffs' complaint and then to [the] petition for removal." *Id.* (internal citation omitted). "[F]ederal courts construe the removal statute narrowly, resolving any doubts against removability." *Lupo* v. *Human Affairs Int'l, Inc.*, 28 F.3d 269, 274 (2d Cir. 1994) (internal citation omitted). When valuing a claim for an injunction, the Second Circuit has instructed that "the court may look not only at past losses but also at potential harm." *A.F.A. Tours, Inc.* v. *Whitchurch*, 937 F.2d 82, 88 (2d Cir. 1991). Lastly, "it remains the general rule that the amount in controversy is measured from the plaintiff's viewpoint." *Maxons Restorations, Inc.* v. *Newman*, 292 F. Supp. 2d 477, 482 (S.D.N.Y. 2003) ("Where the plaintiff seeks injunctive relief, the value of his claim is generally asserted with reference to the right he seeks to protect and

14

measured by the extent of the impairment to be prevented by the injunction." (internal citations and quotation marks omitted)).

Where the amount in controversy claimed by the plaintiff is not apparent from either the complaint or the petition for removal, district courts are permitted to inquire as to the "existence of jurisdiction," so long as the defendant has standing to do so by virtue of also asserting diversity jurisdiction. *Mehlenbacher*, 216 F.3d at 298 (citing *E.R. Squibb & Sons, Inc.* v. *Accident & Cas. Ins. Co.*, 160 F.3d 925, 940 (2d Cir. 1998); *United Food & Commercial Workers Union Local 919* v. *CenterMark Properties Meriden Square, Inc.*, 30 F.3d 298, 306 (2d Cir. 1994) ("Where the pleadings themselves are inconclusive as to the amount in controversy, however, federal courts may look outside those pleadings to other evidence in the record.")). "The salutary practice of determining threshold jurisdictional questions at a preliminary hearing ... is so well settled as to be beyond question." *United States* v. *Montreal Trust Co.*, 358 F.2d 239, 248 (2d Cir. 1966).  Moreover, if only one of Plaintiffs' claims meets the amount in controversy requirement, the court may, in its discretion, exercise supplemental jurisdiction over the remaining claims. *Mehlenbacher*, 216 F.3d at 299.

### 2.   Defendant Has Satisfied the Amount in Controversy Requirement

Plaintiffs did not file a complaint in this matter.  Defendant's removal petition alleges diversity jurisdiction, and recites that the amount in controversy is, in Plaintiffs' own words, "hundreds of thousands [of dollars] in

income." (Not. Rem. ¶ 8). Plaintiffs argue that the phrase "hundreds of thousands" could refer to as little as $200,000, a sum which, divided equally among three Plaintiffs, would fall just short of the jurisdictional threshold. (Pl. Rem. Br. 3). On this basis, Plaintiffs argue that Defendant has not met its burden in demonstrating that removal was proper. In response, Defendant submits sales data from the previous three years for each of Plaintiffs' stores. According to this data, in 2013, Sunni, LLC's average monthly revenues were $97,662; Hinnawi's were $64,073; and Sunni III, LLC's were $54,687. (Def. Rem. Ex. B, Affidavit of Frank Garrido ¶¶ 3, 5, 7).

Plaintiffs have moved for injunctive relief only during the pendency of the arbitration; thus, that is the time period the Court examines for the purposes of this motion. *See Correspondent Servs. Corp.* v. *First Equities Corp. of Florida,* 442 F.3d 767, 769 (2d Cir. 2006) (citing *Kheel* v. *Port of New York Auth.,* 457 F.2d 46, 49 (2d Cir. 1972) ("the amount in controversy is calculated from the plaintiff's standpoint; the value of the suit's intended benefit or the value of the right being protected or the injury being averted constitutes the amount in controversy when damages are not requested" (internal quotation marks omitted))); *see also Hunt* v. *Washington State Apple Advertising Comm'n,* 432 U.S. 333, 347 (1977) ("[i]n actions seeking declaratory or injunctive relief it is well established that the amount in controversy is measured by the value of the object of the litigation" (internal quotation marks omitted)). As it happens, no one — not the parties, not the Court, and not even the arbitrator — knows how long that time period will be. Plaintiffs urge the Court to assume that the

16

arbitration period will last between two and three months.  (Pl. PI Br. 7).[5]  Even assuming that this estimate is accurate, the substantial sales figures demonstrate that each Plaintiff would easily suffer more than $75,000 in lost revenues.  (*Id.*; Def. Rem. Opp. 3-4).

Plaintiffs further protest that because Defendant has submitted information about Plaintiffs' revenues, as distinguished from profits, the Court should disregard that information entirely.  (Mar. 3 Tr. 4-6).  The Court will not do so.  Courts routinely examine revenue, not just profit, when analyzing whether the jurisdictional threshold is satisfied.  *See, e.g.*, *Nat'l Waste Assocs., LLC* v. *TD Bank, N.A.*, No. 10 Civ. 289 (CSH), 2010 WL 1931031, at *1 n.3 (D. Conn. May 12, 2010) (analyzing subject matter jurisdiction in terms of lost revenues).  In response to Plaintiffs' argument, Defendant contends that a "conservative" profit estimate for an EA franchise would be approximately 50%, and even applying this metric to the gross revenues, Sunni, LLC would suffer an estimated $97,662 in lost profits over two months.  (Mar. 3 Tr. 10-11).  Plaintiffs have made no attempt to refute this contention or introduce evidence to the contrary.[6]  This reticence is understandable, inasmuch as Plaintiffs did

---

[5]    Plaintiffs repeatedly stress that that they have done all within their power to expedite the arbitration proceedings, and that the matter should conclude within a few months.  As will be seen in the next section, however, this focus on the short duration of the delay between the resolution of this matter and the resolution of the arbitration diminishes Plaintiffs' claims of irreparable harm.

Plaintiffs' prediction may turn out to be optimistic, but the Court notes that the delay has been shortened somewhat by the several weeks required to review the hearing and post-hearing materials and prepare the Opinion.

[6]    Plaintiffs' March 21, 2014 submission does not change this fact.  *See* Discussion Sec. B(2), *infra*.

not wish to aid EA in demonstrating that the amount in controversy requirement was satisfied here.  However, the Court is left with unrebutted data and an unchallenged (and facially sensible) metric for analyzing it.  Thus, using Defendant's conservative estimate, the Court notes that at least one of the Plaintiffs would likely sustain lost profits greater than $75,000 during the pendency of the arbitration.

More importantly, the amount in controversy should generally be adjudged from the face of a plaintiff's complaint.  Here, Hinnawi represented in state court, in the course of obtaining temporary injunctive relief there, that the amount in controversy was hundreds of thousands of dollars in *income*.  Defendant's sales record evidence clearly supports that assertion, and demonstrates to a reasonable probability that at least one Plaintiff has satisfied the jurisdictional threshold.  Defendant has therefore met its burden, and Plaintiffs' motion to remand is denied.[7]

---

[7]    Alternatively, Defendant argues that Plaintiffs' claims can be aggregated because their New York State court petition alleged a single, unified claim against Defendant on behalf of Hinnawi, who is the part-owner of all three franchises.  (Def. Rem. Opp. 4).  Generally, claims of individual plaintiffs may not be aggregated to reach the amount in controversy.  *Snyder* v. *Harris*, 394 U.S. 335 (1969).  However, aggregation is permitted where (i) a single plaintiff seeks to aggregate two or more claims against a single defendant; or (iii) two or more plaintiffs unite to enforce a single title or right in which they have a common interest.  *Id.*  Plaintiffs argue that their claims are separate because they filed separate arbitration claims.  (Pl. Rem. Br. 4 n.4).

Defendant counters that Plaintiffs' state court petition indicated that Hinnawi had interest in all three Plaintiffs' claims, and would personally lose "hundreds of thousands."  (Def. Rem. Opp. 4).  However, given that Hinnawi was only a part-owner of the franchises, he cannot be said to be a "single plaintiff."  Further, because Defendant has demonstrated that the amount in controversy of at least one Plaintiff likely exceeds $75,000, the Court need not reach this issue.

**B.      Plaintiffs' Motion for a Preliminary Injunction Is Denied**

**1.      Applicable Law**

Preliminary injunctions are "one of the most drastic tools in the arsenal of judicial remedies," and should be used with great care.  *Grand River Enter. Six Nations, Ltd.* v. *Pryor*, 481 F.3d 60, 66 (2d Cir. 2007) (internal citation and quotation marks omitted).  The Court "may grant a preliminary injunction if the moving party establishes (a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief." *Christian Louboutin S.A.* v. *Yves Saint Laurent Am. Holdings, Inc.*, 696 F.3d 206, 215 (2d Cir. 2012) (internal quotation marks omitted) (citing *UBS Fin. Servs., Inc.* v. *W. Va. Univ. Hosps., Inc.*, 660 F.3d 643, 648 (2d Cir. 2011)); *see also Citigroup Global Markets, Inc.* v. *VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 35-38 (2d Cir. 2010) (affirming the viability of the four-element preliminary injunction analysis, including the "sufficiently serious questions" prong, in light of *Winter* v. *Natural Resources Defense Council, Inc.*, 555 U.S. 7 (2008)).[8]

The Agreements provide for the arbitration of any disputes, and the parties agree that the underlying claims are arbitrable.  (*See* Pl. PI Br. 3).

---

[8]      "[I]t is settled" that "once a case has been removed to federal court … federal rather than state law governs the future course of proceedings." *Granny Goose Foods, Inc.* v. *Brotherhood of Teamsters*, 415 U.S. 423, 437 (1974).  Thus, "[t]he question [of] whether a preliminary injunction should be granted is generally one of federal law … though state law issues are sometimes relevant to the decision to grant or deny." *Baker's Aid* v. *Hussmann Foodservice Co.,* 830 F.2d 13, 15 (2d Cir. 1987).

Thus, Plaintiffs seek not to adjudicate the underlying claims, but instead to enjoin Defendant "from taking any action that would in any way cancel, attenuate or otherwise interfere with or encumber plaintiffs' operation of their Edible Arrangements franchises" during the pendency of the arbitration proceedings.  (Pl. PI Br. 1).  "The standard for issuance of a preliminary injunction in aid of arbitration[9] and issuance of a preliminary injunction generally is the same."  *Rex Med. L.P.* v. *Angiotech Pharm. (US), Inc.*, 754 F. Supp. 2d 616, 621 (S.D.N.Y. 2010) (citing *Blumenthal* v. *Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 910 F.2d 1049, 1054 (2d Cir. 1990)).[10]  It should

---

[9]     There is no indication in the record that Plaintiffs moved for an injunction in aid of arbitration pursuant to Section 7502(c) of New York's Civil Practice Law and Rules, which allows state trial courts in the county in which an arbitration is pending to "entertain an application for an order of attachment or for a preliminary injunction in connection with an arbitrable controversy, but only upon the ground that the award to which the applicant may be entitled may be rendered ineffectual without such provisional relief."  *See Traffix, Inc.* v. *Talk.com Holding Corp*, No. 00 Civ. 9802 (AKH), 2001 WL 123724, at *1 (S.D.N.Y. Feb. 13, 2001) (citing N.Y. C.P.L.R. § 7502(c)); *see also* Not. Rem. Ex. B (moving for an "Order to Show Cause," but not specifying the statute pursuant to which such relief was requested).  Even had they moved as such, however, the Court's analysis would remain the same.  The Second Circuit has held that § 7502(c) "incorporates the equitable criteria traditionally required for granting preliminary injunctive relief[, and as a result,] the federal-/state-law distinction [is] largely academic."  *In re M.B. Int'l W.W.L.*, No. 12 Civ. 4945 (DLC), 2012 WL 3195761, at *9 n.4 (S.D.N.Y. Aug. 6, 2012) (citing *SG Cowen Sec. Corp.* v. *Messih,* 224 F.3d 79, 81-85 (2d Cir. 2000)).

[10]    Several Second Circuit decisions have recognized that, when a plaintiff seeks injunctive relief in aid of arbitration, such an injunction is not "preliminary," in the sense that it would not precede a final judgment by the court, but rather functions as a "final" injunction for the limited time period during which the arbitration is pending.  *See, e.g., LaFarge Coppee* v. *Venezolana De Cementos, S.A.C.A.*, 31 F.3d 70, 72-73 (2d Cir. 1994); *Guinness-Harp Corp.* v. *Jos. Schlitz Brewing Co.,* 613 F.2d 468, 471 (2d Cir. 1980).  The Second Circuit has mandated, however, that district courts employ the standards applicable to preliminary injunctions, and not avoid discussion of the merits simply because they will be ultimately decided by an arbitrator.  *See Roso-Lino Beverage Distributors, Inc.* v. *Coca-Cola Bottling Co. of New York, Inc.*, 749 F.2d 124, 125 (2d Cir. 1984) ("The fact that a dispute is to be arbitrated, however, does not absolve the court of its obligation to consider the merits of a requested preliminary injunction; the proper course is to determine whether the dispute is 'a proper case' for an injunction." (internal citations and quotation marks omitted)).

nonetheless be noted that "a preliminary injunction is 'an extraordinary and drastic remedy,' [] that should only be granted where there is a concrete threat that [a] party['s] conduct, if not enjoined, will frustrate the arbitrator's ability to do justice at the conclusion of the arbitration." *In re M.B. Int'l W.W.L.*, 2012 WL 3195761, at *12 (citing *Munaf* v. *Geren*, 553 U.S. 674, 676, 689 (2008); *Winter*, 555 U.S. at 22 ("Issuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with our characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief.")).

### 2.   Application

#### a.   Plaintiffs Have Not Established Irreparable Harm

It is well-settled that "[i]rreparable harm is the single most important prerequisite to the Court's issuance of preliminary injunctive relief." *A.X.M.S. Corp.* v. *Friedman*, 948 F. Supp. 2d 319, 336 (S.D.N.Y. 2013) (citing *Faiveley*

---

Although the parties failed to brief the relevant law in this regard, the Court notes that a few courts have applied a "specific performance" analysis in situations in which the contract between the parties included a status quo provision, requiring the parties to maintain the last peaceable status quo during the pendency of the arbitration. *See, e.g.*, *Nemer Jeep-Eagle, Inc.* v. *Jeep-Eagle Sales Corp.*, 992 F.2d 430, 434 (2d Cir. 1993) ("when a motion for such an injunction is based on a status quo provision in the parties' contract, it must be analyzed under specific performance principles" (internal citations omitted)); *Guinness-Harp Corp.*, 613 F.2d at 471-72 ("to establish its entitlement to an injunction to enforce its interpretation of the status quo provision of the agreement, plaintiff must satisfy the traditional equitable standards for specific performance of a contract"); *but see Suchodolski Associates, Inc.* v. *Cardell Fin. Corp.*, No. 03 Civ. 4148 (WHP), 2003 WL 22909149, at *3 (S.D.N.Y. Dec. 10, 2003) (distinguishing *Nemer Jeep-Eagle* on the basis that there was a status quo provision in that contract, and rejecting the argument that a special, more lenient standard applies to injunctive relief while an arbitration is pending). The parties have not alleged, and the Court has not found, a status quo provision in the Agreements. Accordingly, the Court applies the well-established framework for preliminary injunctions that both parties have cited to it.

*Transp. Malmo AB* v. *Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009)).  "[T]he court may not presume that the plaintiff will suffer irreparable harm." *In re M.B. Int'l W.W.L.*, 2012 WL 3195761, at \*10 (internal citation omitted).  Instead, a plaintiff must demonstrate that the injury alleged to be irreparable is actual and imminent, not merely possible.  *Freedom Holdings, Inc.* v. *Spitzer*, 408 F.3d 112, 114 (2d Cir. 2005).  Importantly, any injury that can be "remedied in money damages is the antithesis of irreparable harm, and such a fact requires that the Court not find an irreparable injury." *Toney-Dick* v. *Doar*, No. 12 Civ. 9162 (KBF), 2013 WL 1314954, at \*9 (S.D.N.Y. Mar. 18, 2013) (collecting cases).  Thus, "[m]ere injuries, however substantial, in terms of money, time and energy ... are not enough." *Jayaraj* v. *Scappini*, 66 F.3d 36, 39 (2d Cir. 1995) (internal citation omitted).  As applicable here, "[w]here monetary damages may provide adequate compensation, a preliminary injunction should not issue." *Id.* (internal citation omitted).

Plaintiffs' arguments regarding irreparable harm are essentially negated by Defendant's decision to assume management of the three franchises during the pendency of the arbitration.  (*See* Def. Mar. 24 Letter).  The stores would not close or lose their leases, and Plaintiffs' employees would remain employed. (*Id.*).  EA would simply keep track of any profits earned, and repay them to Plaintiffs should they succeed at arbitration.  On this basis, Plaintiffs cannot demonstrate that they would suffer any harm, let alone that such harm would be irreparable.

Even if EA did not assume management of the franchises, Plaintiffs have nonetheless failed to demonstrate that they would suffer any irreparable harm. Plaintiffs first contend that they would lose "hundreds of thousands of dollars in income." (Pl. PI Br. 6). Lost profits are quintessentially compensable damages, and it is well-established that "[l]ost profits alone are not sufficient to show irreparable harm." *Freeplay Music, Inc.* v. *Verance Corp.*, 80 F. App'x 137, 138 (2d Cir. 2003) (summary order).

Next, Plaintiffs allege that should the franchises close, a variety of ills would flow therefrom: laying off their employees, giving up their commercial leases, losing their "stellar reputation," and the uncertainty that customers would return should their stores reopen. (Pl. PI Br. 5-6). Yet in so arguing, Plaintiffs proffer neither evidence nor case law indicating that such injuries would be irreparable. (Pl. PI Br. 5-6). In fact, Plaintiffs' only evidence of irreparable harm is Hinnawi's syllogistic testimony from the hearing:

- Should Plaintiffs' access to the online ordering system be terminated, they would lose "access" to "60 percent of [their] customers."

- Because Plaintiffs would lose access to 60% of their customers, they would be forced to close their stores.

- If they were forced to close their stores, those customers may go to other EA franchises, and there is "no guarantee" that those customers would come back.

(Mar. 3 Tr. 58).

Loss of a business can constitute irreparable harm. For instance, in *Nemer Jeep-Eagle*, the Second Circuit found that money damages were

23

inadequate compensation because the plaintiff had been operating his car dealership for only two years, had only recently begun showing a profit, and thus "lack[ed] a track record from which to extrapolate" damages.  992 F.2d at 436.  There is no such "lack[ of] a track record" here.  *Id.*  Defendants have submitted evidence regarding Plaintiffs' monthly sales information for the past three years, and Plaintiffs have not argued, or even disputed, that this information could not simply be used to calculate their lost revenues during the period of arbitration.

On substantively identical facts, the Second Circuit recently upheld a district court decision that distinguished *Nemer Jeep-Eagle*, and found there to be no irreparable injury where the plaintiff's lost profits could easily be calculated from the previous years' financial records.  *Dexter 345 Inc.* v. *Cuomo*, 663 F.3d 59, 63-64 (2d Cir. 2011) (affirming denial of preliminary injunction where plaintiffs could use previous years' rent figures to calculate lost profits and reputational harm).  Plaintiffs have offered no reason why their previous years' sales figures — or, importantly, the sales figures realized during EA's interim management — could not be used to compensate them for any losses suffered during the arbitration.

Put simply, Plaintiffs have failed to demonstrate that any threatened harm would be irreparable.  Even if Plaintiffs' stores did close for a short period of time during the pendency of the arbitration, Hinnawi conceded that he could "get [his stores] *to the level he has them now*" in about a year.  (Mar. 3 Tr. 58 (emphasis added)).  Granted, Hinnawi might need to train new employees and

24

secure commercial leases, at the potential cost of "tens of thousands of dollars," but it could nonetheless be done.  (*Id.*; Pl. PI Br. 6).  Courts in this Circuit have observed that "irreparable harm is found where, but for the grant of equitable relief, there is a substantial chance that upon the final resolution of the action the parties *cannot be returned to the positions they previously occupied.*"  *O.D.F. Optronics Ltd.* v. *Remington Arms Co.*, No. 08 Civ. 4746 (DLC), 2008 WL 4410130, at *6 (S.D.N.Y. Sept. 26, 2008) (internal quotation marks and citation omitted, emphasis added).  Clearly, a harm that could be remedied in full within a year is not, by definition, irreparable.

Plaintiffs have also failed to demonstrate that the loss of their business would be imminent.  A preliminary injunction "should not issue upon a plaintiff's imaginative, worst case scenario of the consequences flowing from the defendant's alleged wrong but upon a concrete showing of imminent, irreparable injury."  *USA Network* v. *Jones Intercable, Inc.*, 704 F. Supp. 488, 491 (S.D.N.Y. 1989); *see also Auto Sunroof of Larchmont, Inc.* v. *Am. Sunroof Corp.*, 639 F. Supp. 1492, 1494 (S.D.N.Y. 1986) (finding no irreparable harm where "[i]nstead of presenting concrete data on how … close it already is to business failure, plaintiff offers only the self-serving statement of its President that its business will collapse. With nothing more than this statement, plaintiff's claim is speculative."); *Christ Gatzonis Elec. Contractor, Inc.* v. *New York City Sch. Const. Auth.*, No. 93 Civ. 2418 (CPS), 1993 WL 262715, at *5-6 (E.D.N.Y. July 2, 1993) (no irreparable harm where plaintiffs "have made only general allegations that … its business will collapse. This is inadequate…. For

all that appears from plaintiffs' papers, the business may survive out of capital or from other revenues."). Plaintiffs have submitted no evidence regarding their current capitalization, their annual or monthly profits, or their ability to withstand a significant loss in business, or even closure, for a short period of time. Plaintiffs have only put forth Hinnawi's declaration that should he "lose access" to 60% of his customers, he would be forced to close the stores. (Mar. 3 Tr. 58).

To supplement their meager evidentiary showing, on March 21, 2014, Plaintiffs submitted belated and unsolicited financial data from Franchise #200 for the month of January 2014, showing that the franchise's expenses exceeded its profits by approximately $4,000. (Pl. Mar. 21, 2014 Letter (Dkt. #27)). Obviously, the carefully selected financial information for their least profitable store, for one bad month, does not reveal the profitability of all three franchises, and says nothing about the capital resources of the franchises as a whole. After all, operating the franchises at a consistent loss is hardly a prudent business model, and certainly would not have engendered the extraordinary request for injunctive relief that Plaintiffs have made here. In short, Plaintiffs could have submitted various forms of evidence in order to demonstrate their ability, or inability, to weather a period of decreased profits or even closure. They made a deliberate decision not to do so, presumably in order to bolster their motion to remand, and instead highlighted for the Court the brevity of the contemplated arbitration proceedings and the operating

shortfall of one store for one month.  The Court simply cannot infer imminent, irreparable harm from this calculated lack of evidence.

Separately, Plaintiffs have failed to demonstrate that any claimed reputational damage would be irreparable or difficult to quantify.  Damage to reputation alone cannot constitute irreparable harm; the plaintiff must also show that such damage is difficult to quantify.  *CRP/Extell Parcel I, L.P.* v. *Cuomo*, 394 F. App'x 779, 781 (2d Cir. 2010) (summary order) ("[W]e have upheld an award of injunctive relief where a movant claimed money damages that were hard to measure *plus* irreparable harm, including loss of reputation, goodwill and business opportunities (citing *Register.com*, 356 F.3d at 404) (emphasis in *CRP/Extell Parcel I, L.P.*)).  Plaintiffs have demonstrated neither.

Instead of offering testimony from their customers, Plaintiffs' evidentiary showing in this regard rests solely on Hinnawi's supposition that there is "no guarantee" that any customers will return to his stores.  (Mar. 3 Tr. 58).  *See, e.g.*, *Xelus, Inc.* v. *Servigistics, Inc.*, 371 F. Supp. 2d 387, 390 (W.D.N.Y. 2005) (irreparable harm found where plaintiff submitted specific evidence demonstrating effects of defendant's negative statements); *see also Bennington Foods LLC* v. *St. Croix Renaissance, Grp., LLP*, 528 F.3d 176, 180 (3d Cir. 2008) (no irreparable harm found where plaintiff failed to submit evidence of potential loss of reputation as to any specific customers).  Of course, "no guarantee" does not equal "irreparable harm."  *See Freeplay Music, Inc.*, 80 F. App'x at 138-39 (affirming denial of preliminary injunction where plaintiff failed to "clearly show[] a loss of prospective goodwill or customers" (internal citations

omitted)).  More pointedly, Plaintiffs have failed to demonstrate — or even allege — that their claimed reputational harm would be difficult to quantify. The Court cannot presume that the claimed damages are impossible to quantify where Plaintiffs neglect even to mention the issue.

Lastly, the Court's finding of no irreparable harm is guided in part by the fact that Plaintiffs have no legal right to continue their businesses under the terms of the Agreements, as a direct and foreseeable result of Hinnawi's admitted criminal conduct.  Defendant terminated the Agreements on the basis of Hinnawi's felony convictions — but it could also do so on the basis of Hinnawi's failure to pay state taxes owed by the franchises, or Hinnawi's failure to abide by the moral standards set forth in the Agreements (*see* Def. PI Ex. A, B, C).  *See, e.g.*, *J.P.T. Auto., Inc.* v. *Toyota Motor Sales, U.S.A., Inc.*, 659 F. Supp. 2d 350, 355-56, 365 (E.D.N.Y. 2009) (denying preliminary injunction where franchisee was already insolvent, and thus would not suffer irreparable harm, and where franchisee showed no likelihood of success on the merits because the defendant could terminate the contract on other grounds as well, including franchisee's "dishonest" and "arguabl[y] fraudulent or criminal" conduct); *Daly* v. *U.S. Fencing Ass'n*, No. 07 Civ. 1167 (LDW) (ARL), 2007 WL 1120461, at *3 (E.D.N.Y. Apr. 16, 2007) (denying preliminary injunction where "there is no realistic probability that plaintiff's business will continue in the future" because defendant could properly terminate the agreement).  In sum, Plaintiffs have failed to demonstrate that they would suffer irreparable harm, and an injunction will not issue for this reason.

### 3. Plaintiffs Have Demonstrated No Likelihood of Success on the Merits

Even if Plaintiffs had demonstrated that they would suffer irreparable harm, they would nonetheless be denied injunctive relief because they have failed to demonstrate a likelihood of success on the merits.  *See Citigroup Global Markets, Inc.*, 598 F.3d at 38  ("The other inquiry relevant to preliminary relief is whether respondents made a sufficient showing of the likelihood of ultimate success on the merits." (citing *Doran* v. *Salem Inn, Inc.*, 422 U.S. 922, 932 (1975))); *see also Zervos* v. *Verizon New York, Inc.*, 252 F.3d 163, 174 (2d Cir. 2001) (affirming denial of preliminary injunction where plaintiff failed to show a likelihood of success or serious questions going to the merits). Plaintiffs must — but unquestionably cannot — show that they are more likely than not to prevail.  *See Davila Pena* v. *Morgan*, 149 F. Supp. 2d 91, 94 (S.D.N.Y. 2001).

Plaintiffs raise two sets of arguments, one related to all three franchises, and one related only to Sunni, LLC (Store #135).  As to all franchises, Plaintiffs argue that Defendant waived enforcement of the Agreements, and that the Agreements' terms violate New York law.  As to Sunni, LLC, Plaintiffs contend that the contract was renewed because there was a meeting of the minds between EA and Hinnawi, and that the doctrine of promissory estoppel prevents Defendant from terminating or not renewing that contract.  (Pl. PI Br. 9-11).  At base, Plaintiffs cannot overcome the fact that Hinnawi admittedly used his EA franchises to defraud the taxpayers for almost the entire duration of the Agreements.  EA is clearly permitted to terminate the Agreements on this

29

basis, and for this reason, Plaintiffs have failed to demonstrate any likelihood of success on the merits.

### a.   Defendant Did Not Waive Enforcement of Any Provisions of the Agreements

As discussed in great detail at the March 3 hearing, the Agreements contain a provision allowing EA to terminate, upon written notice, should the franchisee be convicted of a felony.  (*See, e.g.*, Def. PI Ex. A).  Plaintiffs argue that Defendant waived enforcement of the Agreements because EA delayed for a year in terminating the Agreements after it first learned of Hinnawi's felony convictions.  (Pl. PI Br. 8).  The fact remains, however, that much of the delay can be laid at Plaintiffs' feet.  Hinnawi represented his criminal convictions to Patel to be "not relevant"; he provided EA with a copy of an incomplete, unsigned plea agreement; and he neglected to provide the complete version for almost a year and a half — despite at least a half-dozen requests from EA.  The Court does not find it coincidental that, shortly after Hinnawi provided EA with a copy of the complete plea agreement, EA terminated (and/or elected not to renew) the Agreements.  *See generally* Background Sec. A(3), *supra*.[11]

Contractual rights may be waived if they are intentionally relinquished or abandoned.  *C.R. Klewin Ne., LLC* v. *City of Bridgeport*, 282 Conn. 54, 87 (2007).  However, the Agreements expressly provided that "EA [would] not

---

[11]   EA argues that it was intentionally misled by Hinnawi, because he provided an incomplete plea agreement that was materially different from the actual plea agreement, and delayed in providing that plea agreement for over one year.  (Mar. 3 Tr. 176-77).  There is no direct evidence of any purposeful deception, however, and Defendant's argument in this regard is based solely on the differences between the incomplete and the complete plea agreements.

waive or impair any right … because of any custom or practice at variance with this Agreement's terms." (Def. PI Ex. A, B, C). Such clauses have been upheld and enforced by Connecticut courts, whose law governs the Agreements. *See, e.g.*, *Webster Bank* v. *Oakley*, 265 Conn. 539, 550 (2003) ("[w]hile inconsistent conduct may, under certain circumstances, be deemed a waiver of a right to acceleration, the insertion of a nonwaiver clause is designed to avoid exactly such an inference" (internal citation and quotation marks omitted)).

Sarju Patel testified that although EA's policy is to terminate its franchise agreements with those franchisees convicted of felonies, for its protection, EA waited to obtain a final copy of the plea agreement before taking any action with respect to Hinnawi. (Mar. 3 Tr. 164). Though the Court would have preferred that EA have exercised more diligence, the Agreements shielded EA from waiver in precisely such a situation. Accordingly, EA cannot be deemed to have waived enforcement of the Agreements and Plaintiffs' argument fails in this respect.

### b.    The Agreements Do Not Violate New York Law

Plaintiffs also argue that the provision allowing EA to terminate the Agreements based upon a franchisee's felony conviction violates Article 23-A of the New York Correction Law, N.Y. Correct. L. §§ 750-755, which prohibits discrimination on the basis of a criminal conviction when hiring or granting licenses. (Pl. PI Br. 8, 9 n.4 (citing *NYS Medical Transporters* v. *Perales*, 77 N.Y.2d 126, 131 (1998), for the proposition that a term that violates a state statute is void and unenforceable)). Plaintiffs contend that the "purpose of

[Article] 23-A is not to give ex-offenders preferred treatment, but to remove prejudice against former offenders in obtaining jobs and licenses." (Pl. PI Br. 8). As such, they argue, "any contractual provision that would allow defendant to terminate or refuse to renew the franchise agreements based solely on the existence of a criminal conviction would [] violate New York law." (*Id.*).

Article 23-A is completely inapplicable here. First, Article 23-A, by its terms, is limited to the granting of employment or state licenses. *See* N.Y. Correct. L. § 750(4)-(5). To the extent Plaintiffs seek to expand its application to contract law, it would be a rather remarkable expansion — and one unsupported by the text of the statute or the interpretive case law — to find that Article 23-A prevents a party from ever terminating an agreement with a counterparty who has or subsequently obtains a felony conviction. Plaintiffs have offered no support for this assertion, and the Court finds no reason to expand the statute so far beyond its terms and stated purpose.

Second, Article 23-A defines "license" as one issued by the state; Plaintiffs' "licenses" to operate EA franchises, to the extent the Agreements contained that term, do not qualify. *See* N.Y. Correct. L. § 750(4). Third, Article 23-A specifically states that "[t]he provisions of this article shall apply ... to any ... employment held by any person whose conviction of one or more criminal offenses ... *preceded such employment*." *Id.* § 751 (emphasis added). Because Hinnawi's convictions occurred during the pendency of the Agreements, Article 23-A does not apply. *See Martino* v. *Consol. Edison Co. of*

32

*New York, Inc.*, 965 N.Y.S.2d 86, 87 (App. Div. 2013) ("Because plaintiff's conviction, and an additional subsequent arrest, occurred when he was already employed by Consolidated Edison, they do not provide a basis for a claim under Correction Law Article 23-A."). Notably, Plaintiffs have not sought an injunction barring EA from refusing to hire Hinnawi prospectively — a situation the statute is specifically intended to address — but have instead sought to enjoin EA from terminating its contracts with Hinnawi.

Moreover, even if Article 23-A did apply, it would still not prevent EA from terminating the Agreements. *See* N.Y. Correct. L. § 752 (providing that adverse action may be taken if, among other factors, "[t]here is a direct relationship between one or more of the previous criminal offenses and the … employment sought or held"). Hinnawi admitted to a years-long pattern of theft and underreporting that began shortly after he opened his first EA store, and continued up through 2011. (*See* Def. PI Ex. I). His criminal conduct bears directly on the contract and the contractual relationship; it lasted for almost the entire duration of the Agreement; and it ended only after Hinnawi was investigated and prosecuted by the D.A.'s Office. EA can take no comfort that Hinnawi will not continue this illegal behavior in the future. (*See* Def. PI Opp. 9-10). The Agreements clearly allow EA to terminate on these grounds, and Plaintiffs have failed to put forth any valid reason why this should not be. As such, Plaintiffs cannot demonstrate any likelihood of success on this claim.

### c.  There Was No Meeting of the Minds as to Sunni, LLC's Renewal

Plaintiffs next argue that the contract with Sunni, LLC was renewed because there was a meeting of the minds between Hinnawi and EA.  (Pl. PI Br. 9).  To be sure, under the terms of the expiring Agreement, Sunni, LLC had the right to renew.  (*Id.*).  But the Agreements also provided that Sunni, LLC had that right so long as it satisfied a number of conditions, including bringing the store up to code, abiding by the terms of the Agreement, and returning the Notice of Intended Action.  (Def. PI Ex. A at 4-5).  Even then, the Agreement allowed EA to elect not to renew.  (*Id.* at 5).  Ignoring this, Plaintiffs contend that EA and Hinnawi agreed on the essential terms of the contract and, implicitly, on its renewal.  In so doing, Plaintiffs engage in a fundamental, and ultimately untenable, rewriting of the record.

Plaintiffs' claimed factual history is this:  On June 19, 2013, EA "outlined the terms of a new agreement and specified conditions that Sunni, LLC had to meet before the renewal would be approved.  One of the conditions required Sunni, LLC to refurbish its store."  (Pl. PI Br. 9).  Prior to that, by e-mail dated May 22, 2013, EA had notified Hinnawi that "[r]enewing your franchise agreement requires you to bring your storefront up to our current specifications. All updates must be completed prior to renewing your franchise agreement."  (Def. PI Ex. G).  On June 21, 2013, Hinnawi signed the Notice of Intended Action.[12]  According to Plaintiffs, the parties entered into an

---

[12]     Of course, that Notice made clear to Hinnawi, its signatory, that it "does not create any binding obligation on me or Edible Arrangements," and that the binding obligation

34

enforceable, renewed franchise agreement on August 7, 2013, when EA sent Hinnawi a copy of the proposed agreement, and Hinnawi signed it.  (Pl. PI Br. 10; Mar. 3 Tr. 54-55).

Unfortunately for Plaintiffs, their argument runs headlong into the undisputed facts.  Not only did Hinnawi acknowledge on June 21, 2013, that a binding obligation would be created only when the contract was signed by both parties, but he was also expressly advised in the August 6, 2013 letter that he should *not* sign the agreement until the closing, which would be at least seven days in the future.  (Def. PI Ex. H, J).  And while Plaintiffs claim that Hinnawi signed that renewal agreement, thus evidencing his "acceptance," Hinnawi himself conceded at oral argument (after considerably contradictory testimony) that he did not.  (Pl. PI Br. 10-11; Mar. 3 Tr. 96-97 ("no, no one signed them")).

Undeterred, Plaintiffs argue that the parties agreed on the essential terms, as evidenced by the draft agreement, and by Sunni, LLC's refurbishing of the store.  (Pl. PI Br. 10-11).  However, Sunni, LLC was required to refurbish the store irrespective of whether it sold or renewed the franchise.  More importantly, the correspondence between Hinnawi and EA repeatedly and clearly indicated EA's intent not to be bound until a final closing.  (*See* Def. PI Ex. H, J).  Lastly, even if the contract was orally renewed, it would be unenforceable.  Connecticut's statute of frauds requires that all contracts lasting for more than one year be written and signed: this was a 10-year

---

would only be created "if and when [EA] and I both sign the written agreement."  (Def. PI Ex. H).

franchise agreement that was unsigned by either party.  *See* Conn. Gen. Stat.
§ 52-550(a)(5).  Because there was no meeting of the minds, and even if there
were, the contract would be unenforceable, Plaintiffs have shown no likelihood
of success on the merits of this claim.

### d.   Plaintiffs' Promissory Estoppel Claim Fails

Plaintiffs' promissory estoppel claim also falls short.  Plaintiffs argue that
EA is estopped from claiming that the Sunni, LLC contract was not renewed
because, essentially, Hinnawi renovated his store.  (Pl. PI Br. 11).  Promissory
estoppel has two elements under Connecticut law: (i) the defendant must say
or do something that is calculated to induce another party to believe that
certain facts exist, and to act on that belief; and (ii) the plaintiff must change
its position in reliance on those facts, thereby incurring some injury.
*Chotkowski* v. *State*, 240 Conn. 246, 268 (1997).  "A fundamental element of
promissory estoppel, therefore, is the existence of a clear and definite promise
which a promisor could reasonably have expected to induce reliance.  Thus, a
promisor is not liable to a promisee who has relied on a promise if, judged by
an objective standard, he had no reason to expect any reliance at all."  *Saye* v.
*Howe*, 92 Conn. App. 638, 648 (2005).

According to Plaintiffs, that "clear and definite promise" can be found in
EA's May 22, 2013 e-mail to Hinnawi: if Hinnawi renovated his store, the
contract would be renewed.  (Pl. PI Br. 2, 11).  However, the e-mail contains no
such promise; more importantly, Hinnawi was contractually required to always
maintain his stores to current EA standards, whether for continued operation,

36

renewal, or sale.  (Def. PI Opp. 13 (citing Def. PI Ex. A)).  In other words, whatever Hinnawi planned to do at the expiration of the contract, whether to sell or renew, he was required to upgrade his store's premises.  Thus, the May 22, 2013 e-mail, by its terms as well as its substance, cannot be deemed a promise external to the terms to which Hinnawi was already bound.[13]  Hinnawi was not guaranteed, in any way, that the contract would be renewed if he brought the store up to code.

Finally, the party asserting estoppel must demonstrate that he has exercised "due diligence to know the truth, and that he did not know the true state of things but also lacked any reasonably available means of acquiring knowledge."  *Chotkowski*, 240 Conn. at 268 (internal citations omitted).  Hinnawi did nothing to ascertain whether EA planned to renew the contract, or negotiate for terms providing that if he completed the repairs, he would be guaranteed renewal.  Additionally, as noted earlier, Hinnawi bears responsibility for the fact that his relationship with EA (and, along with that, the renewal process) advanced much further than it ever should have.

Plaintiffs have demonstrated neither irreparable harm nor a likelihood of success on the merits, and their motion must be denied for this reason.  *See, e.g.*, *Toy Mfrs. of Am., Inc.* v. *Blumenthal*, 986 F.2d 615, 620 (2d Cir. 1992) (affirming denial of preliminary injunction where "there [was] no likelihood of success on the merits"); *SG Cowen Sec. Corp.*, 224 F.3d at 79 (affirming denial

---

[13]   Similarly, there is no evidence that such promise was made in the June 2013 telephone conversation between Sarju Patel and Sammy Hinnawi.  *See* Background Sec. A(4), *supra*.

of preliminary injunction in aid of arbitration where plaintiff failed to demonstrate likelihood of success on the merits, irreparable harm, or a balance of the equities); *AFA Dispensing Grp. B.V.* v. *Anheuser-Busch, Inc.*, 740 F. Supp. 2d 465, 472-74 (S.D.N.Y. 2010) (denying motion for preliminary injunction during pendency of arbitration proceedings where plaintiff had failed to demonstrate irreparable harm or likelihood of success on the merits); *Andersen Consulting Bus. Unit Member Firms* v. *Andersen Worldwide Societe Co-op.*, No. 98 Civ. 1030 (JGK), 1998 WL 122590, at *10 (S.D.N.Y. Mar. 18, 1998) (denying motion for preliminary injunction in aid of arbitration where plaintiff failed to demonstrate irreparable harm or likelihood of success on the merits).

### 4. There Are No Serious Questions Going to the Merits

Plaintiffs argue that even if they have not established a likelihood of success on the merits, they have identified serious questions about the parties' respective positions that merit the grant of injunctive relief.  (Pl. PI Br. 11-12). Yet Plaintiffs omit discussion of any of these serious questions, opting instead to restate the financial hardships they would face should a preliminary injunction not issue.  (*Id.*).  Having failed to demonstrate any likelihood of success on the merits, it follows that Plaintiffs also cannot demonstrate that there are any serious questions going to the merits.  *See Citigroup Global Mkts., Inc.,* 598 F.3d at 35 (noting that "[t]he overall burden under [the serious questions] prong is no lighter than under the 'likelihood of success' standard" (internal citation and quotation marks omitted)).

Similarly, the balance of the equities does not tip in Plaintiffs' favor.  The Court is mindful of the consequences that may flow from Hinnawi's admission of responsibility for the criminal conduct in which he engaged, but that mindfulness cannot support injunctive relief.  The fact remains that Plaintiffs have not met their burden of demonstrating any likelihood of success on the merits, because Hinnawi's admitted criminal conduct is a valid ground upon which EA may terminate or not renew the Agreements.  Similarly, Plaintiffs have failed to establish — beyond simply incanting the word "irreparable — that the denial of their motion would in any way affect the arbitrator's ability to do justice.  Quite the opposite, EA intends to assume management of the stores during the pendency of the arbitration, and can simply keep track of and repay any profits to Plaintiffs, should they prevail.  And even if the stores were to close during the pendency of the arbitration, Hinnawi conceded that he could have the stores back at the level they are now within a year.

The Second Circuit has specifically directed district courts to consider the merits of the underlying dispute when determining whether to grant injunctive relief in aid of arbitration, even though those claims will ultimately be decided by an arbitrator.  *See, e.g.*, *Blumenthal*, 910 F.2d at 1053 (recognizing that "[a]rbitration can become a 'hollow formality' if parties are able to alter irreversibly the status quo before the arbitrators are able to render a decision in the dispute," but holding that "the parties are free to litigate the necessity of an injunction under traditional principles, and *a district court may decline to issue one upon being satisfied that there is no point in doing so*."

39

(internal citations omitted and emphasis added)); *see also Am. Exp. Fin. Advisors Inc.* v. *Thorley*, 147 F.3d 229, 231 (2d Cir. 1998) ("the expectation of speedy arbitration does not absolve the district court of its responsibility to decide requests for preliminary injunctions on their merits…. *[n]or is this duty affected by the pro-arbitration policy manifested in the [Federal Arbitration Act]*" (internal citations omitted and emphasis added)).  Here, the Court has considered the merits and determined that there is simply no point in issuing a preliminary injunction to preserve a status quo that has no legal right to be preserved.

An arbitrator will hear Plaintiffs' claims in next few months.  Thus, "[h]aving considered the merits of [Plaintiffs'] application and having found it wanting, the Court takes comfort in the fact that, in short order, the forum that the parties have chosen for resolving the merits of their dispute will be available to them."  *In re M.B. Int'l W.W.L.*, 2012 WL 3195761, at *13.

## CONCLUSION

For the reasons set forth herein, Plaintiffs' motion to remand is DENIED. The Clerk of Court is directed to terminate Docket Entry 16.

Plaintiffs' motion for a preliminary injunction is also DENIED. The Clerk of Court is directed to terminate Docket Entry 14.

The Court's Opinion and Order shall take effect on April 4, 2014, so that Plaintiffs may, if they choose, seek further relief at the Second Circuit.

The Clerk of Court is directed to mark the case as closed.

SO ORDERED.

Dated: March 25, 2014
         New York, New York

_____
        KATHERINE POLK FAILLA
        United States District Judge